**3N THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

MICHELLE KEENE, LEANNE BENNETT, : 
and THOMAS CREWS, :
:
    **Plaintiffs,** :
:     **Civil Action No.**
    **v.** :     **7:09-cv-141 (HL)**
:
CHRIS PRINE, Individually and in his :
official capacity as Sheriff of Lowndes :
County, Georgia; and LOWNDES :
COUNTY, GEORGIA :
:
    **Defendants.** :
——————————————————— :

# ORDER

Before the Court is a motion to amend the complaint (Doc. 62) filed by the

Plaintiffs Michelle Keene ("Keene"), Leanne Bennett ("Bennett"), and Thomas Crews

("Crews") and a motion for summary judgment (Doc. 35) filed by Defendants Chris

Prine, Sheriff of Lowndes County ("Sheriff Prine"), and Lowndes County, Georgia

("the County"). For the following reasons, the motion to amend is denied (Doc. 62)

and the motion for summary judgment (Doc. 35) is granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Keene, Bennett, and Crews are former employees of the Lowndes County

Sheriff's Office ("the Sheriff's Office"). They allege that Sheriff Prine wrongfully

---

[1] The Court construes the facts in the light most favorable to the Plaintiffs. See
Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir.2004) (requiring that the
Court view the facts in the light most favorable to the nonmoving party).

terminated their employment because they supported Sheriff Prine's opponent during the 2008 campaign for sheriff. The Plaintiffs also allege they were terminated because of their sex, pregnancy, disability, age, former complaints of discrimination, and for requesting time off from work.

The facts are as follows: Chris Prine ran for the Democratic nomination for the Sheriff of Lowndes County position in 2008. His opponents in the primary election were J.D. Yeager ("Yeager") and Roy Hart. (Yeager Decl. ¶¶ 4, 5). No Democratic candidate won the primary election, so a run-off election was held. Prine won the Democratic nomination and then defeated the Republican candidate in the general election. Prine assumed office at midnight on January 1, 2009.

All three Plaintiffs were employed at the Sheriff's Office during the election season. Keene, ranked captain, led the Jail Operations Division (the "Jail"). Crews, ranked lieutenant, worked in investigations. (Crews Decl. ¶ 4). Bennett, ranked sergeant, supervised the K-9 dog unit. Bennett's husband worked in the Sheriff's Office and supervised Bennett. All three Plaintiffs supported Yeager's candidacy for sheriff. (Crews Decl. ¶ 18). After Sheriff Prine assumed office, the Plaintiffs were terminated.

## A.    Facts Pertaining to Crews

Sheriff-Elect Prine terminated Crews on December 31, 2008 because Crews "talked bad about [Sheriff Prine] in Lake Park during the campaign." (Crews. Decl. ¶ 34) and "openly campaigned against him." (Crews Decl. ¶ 35). Crews was fifty-

nine. (Crews Decl. ¶ 41). Sheriff Prine offered to allow Crews to resign in lieu of termination so that he could draw his retirement. (Crews Decl. ¶ 36). Crews resigned. (Crews Decl. ¶ 44).

In his deposition, Sheriff Prine explained what he meant by Crews "talk[ing] bad about him." Sheriff Prine heard Crews say during the campaign that "[Prine's] ass doesn't need to be the sheriff of Lowndes County." (Prine Dep. at 61). Crews denies making this statement. (Crews Decl. ¶ 30). Sheriff Prine admitted that Crews' belief as to who should be sheriff was part of the reason that he did not retain Crews. (Prine Dep. at 62). Sheriff Prine also testified that he terminated Crews because he "had someone else in mind that [he] wanted to put in that position." (Prine Dep. at 32). Sheriff Prine desired to hire Logan Henderson ("Henderson"). (Prine Dep. at 32). Sheriff Prine further felt that Crews' length of service was a reason to terminate him. In addition, Sheriff Prine heard rumors that "some of the cases that [Crews] was working on . . . was getting out in the street, and it should not have been." (Prine Dep. at 29-30) and Sheriff Prine knew Crews had a gambling problem (Prine Dep. at 51, 63).

During his employment at the Sheriff's Office, Crews suffered injuries to his knees. (Crews Decl. ¶ 6). In 2000 he received knee replacement surgery. (Crews Decl. ¶ 11). During the time leading up to his termination Crews could not run or stand for prolonged periods of time, but he could perform the functions of his sedentary desk job. (Crews Decl. ¶ 17). Crews received a second knee replacement

surgery on January 22, 2009. (Crews Decl. ¶ 15). He requested time off for the surgery before he was terminated, but intended to use his comp time to cover the days before using FMLA[2] leave. (Crews Decl. ¶ 15). He never requested FMLA leave (Crews Dep. at 37). During the termination meeting Deputy Joe Crow asked Crews when he was scheduled to have knee replacement surgery. (Crews Dep. at 28-29). Crews responded "you already know when my knee surgery is going to be." (Crews Dep. at 29).

The Sheriff's Office provided to the Georgia Department of Labor a notice of separation that stated Crews "resigned." (Crews Decl. ¶ 50). The Sheriff's Office provided the Georgia Peace Officers Standards and Training Council a change of status form for Crews describing the reason for his termination as "career retirement" instead of "resignation in lieu of dismissal." (Crews Decl. ¶¶ 53, 54). On both of these forms, the Sheriff's Office was required to provide the circumstances underlying the separation. (Crews Decl. ¶¶ 49, 53). No reasons were given.

After Crews resigned Sheriff Prine hired Henderson, but Henderson did not perform Crews' former duties. Yeager initially filed Crews' position (Prine Dep. at 78). Later other officers filled the slot.

Crews complains that his rights to political association and to take FMLA leave and to be free from age and disability discrimination were violated when Sheriff Prine

---

[2] The FMLA is the Family Medical Leave Act, 29 U.S.C. § 2612 *et seq*. The FMLA allows eligible employees to take time off from work for qualified reasons.

told him to resign or be terminated.

### B. Facts Pertaining to Bennett

Bennett is Yeager's sister. (Bennett Decl. ¶ 9). She campaigned for Yeager in the 2008 election by urging people to vote for him, putting out campaign signs, handing out literature, and attending campaign events. (Bennett Decl. ¶ 12). Bennett expressed her view on numerous occasions that Yeager was better qualified than Prine to assume the office of sheriff. (Bennett Decl. ¶ 12).

Prior to the runoff election, Bennett campaigned at an event known as the "100 Black Men Barbeque." (Bennett Decl. ¶ 14). Prine was also there to campaign. Prine spoke with Bennett at the event. Their conversation led Prine to decide to terminate Bennett if he became sheriff.

The facts of the conversation are that Prine walked over to Bennett and said "you need to move away from here; you've come over here to interfere with me." (Bennett Decl. ¶ 16). Bennett responded saying "it's a public sidewalk; I can hand out literature just like you can." Prine then pointed his finger in Bennett's face and said, "Let me tell you something . . . ." Bennett interrupted, "I don't care who you are; get your finger out of my face . . . I am handing out literature." (Bennett Decl. ¶ 17). Prine said to Bennett that she had "been saying all kinds of stuff about him" and "running [her] mouth negatively about him." (Bennett Decl. ¶ 17). Bennett said that he was mistaken and then told Prine that he was spreading rumors about her family. (Bennett Decl. ¶ 17).

The rumor to which Bennett referred was that Yeager was a "deadbeat Dad." (Bennett Decl. ¶ 18). Prine stated to Bennett that at no point had he called Yeager a "deadbeat dad" or encouraged anyone else to do so. (Prine Dep. at 94). According to Prine a man named Lloyd Carter was responsible for the "deadbeat dad" allegation. (Prine Dep. at 97-98). Sheriff Prine informed Carter that he objected to the term "deadbeat dad," but Carter persisted in using it. (Prine Dep. at 98-99).

Sheriff Prine's decision to terminate Bennett was made after Bennett told him he was responsible for the "deadbeat dad" rumors. (Prine Dep. at 101-102). He felt that Bennett was loud and boisterous during the conversation and he did not like that she accused him of doing something that he did not do. (Prine Dep. at 102).

The day after he took office, on January 2, 2009, Sheriff Prine told Bennett that he did not want her to work for him, saying that the reason was personal and that he needed loyal people working for him. (Bennett Decl. ¶¶ 29, 30.) Bennett did not stop working immediately. She met with Sheriff Prine again and asked him to think the decision over. (Prine Dep. at 103). At their last meeting, he asked her if she would be willing to work in a different job, but she interrupted him when she said "No. My love is for K-9 and that's what I want to do." He told her that she could not continue to work at the K-9 unit because her husband was her supervisor. (Prine Dep. at 103-104). Bennett asked Prine whether he would transfer the K-9 unit to

another supervisor, but Prine refused.[3] (Bennett Decl. ¶¶ 40-41). Sheriff Prine told her that her termination was not "purely personal" but also was because she was "under the supervision of [her] husband." (Bennett Decl. ¶ 29). The termination notices to the County HR department and the Department of Labor did not indicate the reason for Bennett's termination. Bennett's duties were assumed by male employees. (Bennett Decl. ¶ 51).

Bennett was seven months pregnant when she was terminated. Prior to her termination Bennett submitted a FMLA leave request for maternity leave to the County HR Department. (Bennett Decl. ¶ 26).

Bennett alleges her termination violated her right to freedom of political and familial association, her right to be free from gender and pregnancy discrimination, and her right to take FMLA leave.

### C. Facts Pertaining to Keene

Keene began working for the Sheriff's Office in 1994. (Keene Decl. ¶ 2). After a series of promotions she reached the rank of captain in 2007. (Keene Decl. ¶ 3). From 2003-2008 Keene received favorable annual performance evaluations. (Keene Decl. ¶¶ 4-10). During the time that Sheriff Prine was her supervisor she never received a written reprimand for deficient performance. (Keene Decl. ¶ 11). Sheriff Prine terminated her employment in October 2009.

---

[3] Sheriff Prine transferred the K-9 unit to another division after he fired Bennett. (Bennett Decl. ¶ 42)

The Sheriff's Office followed the chain of command. (Keene Decl. ¶ 15).  The chain of command is that orders are sent from a high ranking officer to lower ranked officers and communications between officers are usually sent up the chain of command to consecutively higher ranked officers. (Keene Decl. ¶ 16). Keene was the highest ranking officer at the Jail.  (Keene Decl. ¶ 21). Above her in the chain of command were Sheriff Prine and his chief deputy, Joe Crow ("Chief Crow"). The Jail employed approximately 100 persons.

On December 31, 2008, Sheriff-Elect Prine met with Keene. He spoke to Keene about Annette Williams ("Williams"), a staff sergeant who worked for Keene. Prine told Keene that he did not want Williams working at the Sheriff's Office anymore (Keene Decl. ¶ 38). Keene interpreted Sheriff Prine's statement to mean that he wanted Keene to terminate Williams, but Keene chose not to take action until she received further direction from Prine. (Keene Decl. ¶ 39).  Keene was concerned that Williams had filed EEOC charges of discrimination in 2007 and 2008 claiming that she was suspended from work for discriminatory reasons. Keene was named in the EEOC charge as the perpetrator of the discrimination.

The Jail was known to have physical problems. (Keene Decl. ¶ 23).  Keene met with Sheriff Prine to discuss the conditions at the Jail. (Keene Decl. ¶ 25). Sheriff Prine told Keene to maintain the status quo. (Keene Decl. ¶ 26).  At another meeting between Sheriff Prine and Keene, Sheriff Prine told Keene that "as far as I'm concerned you're doing a good job and you're going to stay where you're at . .

8

. ." (Keene Decl. ¶ 60).[4]

On January 7, 2009 Keene met with Chief Crow and Sheriff Prine to discuss the Jail construction project. Chief Crow and Sheriff Prine told Keene that she was not going to supervise the project; instead, Lt. Clifton was to oversee the project because Lt. Clifton had a construction background. (Keene Decl. ¶ 63). Previously Keene had led the project. (Keene Decl. ¶ 64). Keene believes that the decision to relieve her of the construction project was because of a "male-female gender stereotype on the parts of Sheriff Prine and/or Chief Crow." (Keene Decl. ¶ 67).

On January 7, 2009, Sheriff Prine asked Keene about whether she had "thought any more" about Williams. (Keene Decl. ¶ 69). Keene responded that she felt it would be improper to terminate Williams because she recently filed an EEOC charge and no new cause had arisen to justify her termination.

At a command staff meeting on February 3, 2009 Keene expressed frustration about the failure of officers to follow the chain of command. Keene felt that in two instances she was bypassed. (Keene Decl. ¶¶ 74-76).

On February 4, 2009, Keene, Chief Crow, Sheriff Prine and County Attorney Elliot met to discuss Williams. Keene secretly recorded the conversation. Attorney Elliot expressed the view that Sheriff Prine should terminate Williams even though it meant that Williams would sue for retaliation. He told Sheriff Prine to state that her

---

[4] Sheriff Prine made this statement after Keene asked him about a rumor involving her resignation. Keene did not know where or why the rumor started.

EEOC charges had nothing to do with her termination and that the reason for her termination was because Williams was not serving the best interests of Sheriff Prine's administration. (Keene Decl. ¶ 86).

In March 2009 Keene's attorney sent a letter to Sheriff Prine asserting various legal claims. (Keene Decl. ¶ 89). The letter stated that Keene was the victim of discrimination and retaliation when she was relieved of her responsibility to supervise the Jail construction project and when she was not informed of problems in violation of the chain of command. (Keene Decl. ¶ 92). After Sheriff Prine received the letter, Keene perceived Sheriff Prine's attitude to be hostile toward her. (Keene Decl. ¶ 96). In response to his demeanor and to comply with the chain of command, Keene directed the majority of her communications to Chief Crow. (Keene Decl. ¶ 97). Keene filed her EEOC charge on April 15, 2009. (Keene Decl. ¶ 109).

In April 2009, Sheriff Prine advised Keene and other officers that they had to wear a "Class A" uniform at all times. (Keene Decl. ¶ 114). Sheriff Prine felt that Keene dressed inappropriately some days by wearing jeans and blouse. (Prine Dep. at 140). In May 2009 Keene was told by Sheriff Prine's secretary that Sheriff Prine delegated the responsibility of negotiating the Jail's medical contract to Lt. Clifton. (Keene Decl. ¶ 118). Keene previously negotiated the medical services contract. (Keene Decl. ¶ 119).

In June 2009 Keene selected applicants to interview for open jail officer positions. (Keene Decl. ¶ 128). She selected the candidates she thought were the

most qualified. (Keene Decl. ¶ 129). Keene stated that she discussed the hiring process with Chief Crow and Sheriff Prine. (Keene Decl. ¶ 131). While Keene was on vacation in July, the hiring board interviewed the candidates she selected for interview. (Keene Decl. ¶ 145). None of the candidates were hired. Instead, Sheriff Prine convened a second hiring board and hired three individuals without Keene's input or participation. (Keene Decl. ¶ 146). Sheriff Prine hired two individuals that Keene had eliminated from the applicant pool because they had previous experience at the Sheriff's Office, but had been involuntarily terminated. (Keene Decl. ¶ 147).

When Keene returned from vacation, Keene and Lt. Clifton met with Sheriff Prine and Chief Crow. At the meeting Keene was given a letter from Sheriff Prine instructing her and her staff to address issues at the Jail. (Keene Decl. ¶ 149). The letter instructed Keene to file a comprehensive report addressing the issues within seven days. (Keene Decl. ¶ 151). Keene was asked to identify security problems at the Jail, develop hiring guidelines, as well as develop plans to improve communications among the staff, inmate medical problems, and phone operations. Keene was shocked by the letter and contends that she managed each of the issues properly and that she routinely addressed Jail operations concerns with Sheriff Prine and Chief Crow. (Keene Decl. ¶¶ 152-53). She submitted her report to Sheriff Prine on August 7, 2009. (Keene Decl. ¶ 172).

On July 31, 2009, an anonymous letter addressed to Sheriff Prine was mailed to Chief Crow. The letter was signed by "your very concerned jail operations

division." (Keene Decl. ¶ 161). The letter complains about the working conditions in the Jail and the management work ethic and informs Sheriff Prine that employee morale is down. (Keene Decl. ¶ 162). The letter refers to an unnamed female officer as a "pit bull holding a steak." (Keene Decl. ¶ 162). Sheriff Prine never informed Keene that he received the letter nor did he notify her about the substance of the letter. (Keene Decl. ¶ 166). Sheriff Prine also received weekly grievances from inmates about jail conditions. (Prine Dep. at 165).

On August 3, 2009 a meeting was held to discuss jail operations. Keene was not informed about the meeting; consequently, she was not present. (Keene Decl. ¶ 178). The meeting points describe jail conditions and officer functions needing improvement. For example, it describes the leadership at the jail as being deficient. Superior officers are accused of not visiting duty officers because they are watching too much TV. (Keene Decl. Ex. 40). Chief Crow received a copy of the meeting points, but he did not provide Keene a copy. (Keene Decl. ¶ 183).

On August 4, 2009, Sheriff Prine told Keene that he decided to reorganize management positions at the Jail. Sheriff Prine demoted Lt. Elkins two levels and demoted Sr. Staff Sergeant Swain one level. (Keene Decl. ¶ 174). Keene was not promoted or demoted. (Keene Decl. ¶ 174). On August 11, 2009, another meeting occurred between Keene, Sheriff Prine, and Chief Crow. Sheriff Prine explained that he reorganized management because "of the turnover rate" and because he had received complaints from inmates and officers at the jail. (Keene Decl. ¶ 203). He

then told Keene[5]

> I don't understand why you're not familiar with the problems over there. If you go back to the jail and you talk to them, and you communicate with them, and you communicate with us, as us communicating with you, you would. So, you know, that's the reason I made the changes . . . But, if I don't hear anything from you and I hear it from everybody else over there and not from you then that's a lack of communications on your part.

Later in the conversation, he said to Keene

> When [the jail officers] are disgruntled, because they never get to talk to a supervisor, they never see one, you or the lieutenants back there in the back when they never see and they don't feel comfortable about even talking to you, then that's a problem. That's a problem with supervision. . . We need communications . . . They need to communicate with you if they've got a problem. You need to communicate to us. And then likewise, we can go back to you. So, yes, we do have a problem.

(Keene Decl. ¶ 203).

Finally, he warned Keene "I'm telling you right now – if things don't change over there – you won't be there – you understand . . . ." (Keene Decl. ¶ 203).

Once Sheriff Prine assumed office, Chief Crow began conducting weekly walkthroughs of the jail. Keene accompanied Chief Crow on his visits, updating him on events at the Jail. (Keene Decl. ¶ 41). Keene also sent Chief Crow letters/memos, reports, and e-mails. (Keene Decl. ¶ 44). Keene believes that she communicated with Chief Crow on a sufficient basis. (Keene Decl. ¶ 44). Chief Crow told Sheriff Prine that Keene would "get mad" when she met with Chief Crow (Prine Dep. at 158).

---

[5] Keene recorded the conversation without Sheriff Prine's knowledge.

Keene also believes she frequently communicated with Sheriff Prine. (Keene Decl. ¶ 46). Sheriff Prine contends that Keene did not communicate with him enough (Prine Dep. at 140). Sheriff Prine testified that he told Keene to visit him, (Prine Dep. at 140), but Keene denies that Sheriff Prine reprimanded her for her lack of communication. Sheriff Prine felt that Keene was insubordinate. (Prine Dep. at 171).

On October 26, 2009, Sheriff Prine presented Keene with a termination letter. The letter stated that Keene's performance and leadership were insufficient. Sheriff Prine stated "the note that you have there in front of you is self explanatory. If you'll read it again. The thing about it is . . . is that with all the other Captains I have good communications. I have given you . . . seven months . . . . (Keene Decl. ¶ 218).

Keene was not provided with a Georgia Department of Labor Notice of Separation form. (Keene Decl. ¶ 222). Later the Sheriff's Office reported that she was fired for "unsatisfactory work performance." (Keene Decl. ¶ 224). Keene was awarded unemployment benefits. The Department of Labor concluded that she was not warned that her performance was deficient before she was terminated. (Keene Decl. ¶ 225).

Keene claims she was terminated because of her gender and in retaliation for complaining about Sheriff Prine's discriminatory actions. She also claims she was terminated because she supported Yeager during the 2008 campaign.

The Plaintiffs' complaint named Lowndes County Sheriff's Office as a

Defendant. After determining that the Sheriff Office's lacked the capacity to be sued, the Court dismissed it as a defendant. (Doc. 20).

The Plaintiffs assert ten claims in their complaint, filed on December 3, 2009. The claims are:

Count One: 42 U.S.C. § 1983 claim for violations of Plaintiffs' First Amendment right of freedom of political affiliation.

Count Two: 42 U.S.C. § 1983 claim for violation of Bennett's First Amendment right of freedom of familial association.

Count Three: 42 U.S.C. § 1983 violation of Bennett's and Keene's First Amendment right of freedom of religion.

Count Four: 42 U.S.C. § 1983 violation of Bennett's and Keene's Fourteenth Amendment right to be free from gender discrimination.

Count Five: Violation of Keene's rights under the Georgia Whistleblower Protection Act.

Count Six: Violations of Keene's and Bennett's Gender/Pregnancy/Religious rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Count Seven: Keene was terminated in retaliation for her complaints about Sheriff Prine.

Count Eight:[6] Crews was terminated in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

Count Nine: Crews was terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

Count Ten: Crews and Bennett were terminated in retaliation for their

[6] The complaint misnumbers the counts beginning with Count Eight.

assertion of their Family Medical Leave Act ("FMLA") rights, 29 U.S.C. § 2612(a).

The Plaintiffs ask to recover lost wages, damages for emotional distress, punitive damages, liquidated damages, costs and reasonable attorneys' fees, and seek equitable relief.

## II.    MOTION TO AMEND

Count One of the complaint is a 42 U.S.C. § 1983 claim for violations of Plaintiffs' First Amendment right to freedom of political affiliation. The Defense reads Count One to include only a political patronage/affiliation claim and not a First Amendment retaliation "speech-expression" claim.  Plaintiffs object to the Defense's reading of the complaint.  They admit that the complaint does not allege that they were fired due to their speech, but they argue the complaint meets the pleading requirements because it alleges that the Plaintiffs were fired for their "support" of Yeager.  Plaintiffs do not see any pleading deficiency, but in an abundance of caution they ask the Court for leave to amend their complaint to include a claim for violation of their First Amendment free speech rights.

The Federal Rules state that "the court should freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A district court should not deny leave to amend "unless there is a substantial reason."  Burger King Corp. v. Weaver, 169 F.3d 1310, 1319 (11th Cir.1999).  A motion to amend may be denied on "numerous grounds, such as undue delay, undue prejudice to the defendants,

and futility of the amendment." Carruthers v. BSA Adv., Inc., 357 F.3d 1213, 1218

(11th Cir. 2004) (citation omitted).

The Court is persuaded that alleging "support" for a candidate does not allege

a free speech claim. But even if the Court viewed the complaint as containing a free

speech claim or allowed the amendment, the claim would be dismissed on qualified

immunity grounds. Since the amendment is futile; the motion to amend is denied.

The reasons for why qualified immunity would bar the free speech claim are

explained further below in the Order.

## III.    CLAIMS DISMISSED BECAUSE OF ABANDONMENT OR AGREEMENT

The Plaintiffs agree with the Defendants that certain claims should be

dismissed. They agree to dismiss claims against Sheriff Prine, in his individual

capacity, for violations of the ADA, FMLA, ADEA, and Title VII. They also agree that

Lowndes County, Georgia should be dismissed as a defendant. Bennett and Keene

have abandoned the claims found in Count Three and Six for religious

discrimination. Bennett abandoned her claim in Count Two for familial association.

To the extent that any hostile work environment claim may have existed, that claim

is also abandoned. The Court accordingly dismisses Lowndes County, any

religious, familial association, or hostile work environment claim asserted by the

Plaintiffs, and all claims against Prine, in his individual capacity, for violating the

ADA, FMLA, ADEA, and Title VII.

The remaining claims are in dispute. The Court will determine if there are

genuine issues of material fact present in the record to defeat summary judgment.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000). The court may not, however, make credibility determinations or weigh the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. Id. If the evidence that the nonmovant presents, however, is "not significantly probative" or "merely colorable," then summary judgment may be granted. Liberty Lobby, 477 U.S. at 249.

"For factual issues to be considered genuine, they must have a real basis in the record." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Id. (citation omitted).

18

## V.  SUMMARY JUDGMENT CONCLUSIONS OF LAW

### A.  Claims Against Sheriff Prine in His Official Capacity for Damages

Sheriff Prine asserts that he cannot be liable in his official capacity for the Plaintiffs' statutory and constitutional claims except those arising under Title VII because he has Eleventh Amendment immunity.  The Eleventh Amendment protects a state from being sued in federal court for damages unless the state has consented to suit or Congress has validly abrogated the state's immunity.  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003); Williams v. Bd. of Regents of Univ. Sys. of Georgia, 477 F.3d 1282, 1301 (11th Cir. 2007).

To determine whether Sheriff Prine has Eleventh Amendment immunity, the Court must determine: (1) whether he acts as an arm of the state when making employment decisions; and (2) if yes, whether Congress has eliminated Eleventh Amendment immunity for any of the Plaintiffs' claims or whether the State of Georgia has consented to suit.

### 1.  The Sheriff Acts as an Arm of the State

Sheriff Prine contends that a suit against him in his official capacity is a suit against the state of Georgia. This Court addressed the same issue recently in Ashely v. Chafin, Civil No. 7:07-cv-177,  2009 WL 3074732 (M.D. Ga. Sept. 23, 2009).  In that case, a suit against the sheriff was deemed to be a suit against the state of Georgia because the sheriff was determined to act as an arm of the state  in relation to making employment decisions. Ashley, 2009 WL 3074732, at * 13.  For the same

19

reasons stated in <u>Ashley</u>, which the Court will restate in this Order, Sheriff Prine acts

an arm of the state when he makes employment decisions.

To fall under the Eleventh Amendment's protection, a defendant need only be

acting as an "arm of the State," which includes agents and instrumentalities of the

State. The inquiry requires the Court to look to the sheriff's role "in a particular area,

or on a particular issue." <u>McMillian v. Monroe Cnty.</u>, 520 U.S. 781, 785-86, 117 S.

Ct. 1734, 138 L.Ed.2d 1 (1997).

Whether an entity is an "arm of the State" is a question of federal law, but the

question can be answered only after considering provisions of state law. <u>Manders</u>,

338 F.3d at 1309. The Eleventh Circuit has developed four factors for consideration

to determine the "arm of the state" question. The factors are: (1) how state law

defines the entity; (2) what degree of control the state maintains over the entity; (3)

where the entity derives its funds; and (4) who is responsible for covering judgments

against the entity. <u>Id.</u> at 1309.

In applying the first factor to this case, the Court finds that Sheriff Prine, in his

official capacity, is defined by the state as a state entity.[7] In <u>Manders,</u> the court

reviewed Georgia law and determined that the "sheriff's obligation to administer the

---

[7]Georgia's Constitution grants the State legislature the exclusive authority to establish and to control a sheriff's powers and duties. Ga. Const. art IX § 1, ¶ 3(a)-(b). The Sheriff's Office is a separate constitutional office independent from the County and its governing body. See Ga Const. art IX. § 2, ¶ 1(c) (1); <u>see also</u> <u>Manders</u>, 338 F.3d at 1310. The sheriff is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission. See <u>Chafin v. Calhoun</u>, 262 Ga. 202, 415 S.E.2d 906 (1992); see also <u>Manders</u>, 338 F.3d at 1310.

jail [is] directly derived from the State and not delegated through the county entity."

Manders, 338 F.3d at 1309. This Court concludes that the requirement to "administer" the Jail would certainly include employment and staffing decisions.

Regarding the second factor, the state of the Georgia maintains the majority of control over the Sheriff's Office. See id. at 1322 (finding that "because of the State's direct and substantial control over the sheriff's duties, training, and discipline and the county's total lack thereof, this control factor also weighs heavily in favor of [the sheriff being] entitle[d] to Eleventh Amendment immunity").

As for the third factor, the Court recognizes that the Sheriff's Office collects a majority of its funding from Lowndes County. Nevertheless, serving as the source of the funding does not provide Lowndes County any control over the Sheriff's Office. Id. at 1323-1324. The Georgia Constitution prevents Lowndes County from taking any action affecting the Sheriff's Office or its personnel. Id. Additionally, the state does provide some funding for the Sheriff's Office. Id. at 1323. For instance, the state provides funding for the annual training of sheriffs, for the Governor's disciplinary procedure over sheriffs' use of excessive force, and for the housing of some state prisoners in county facilities under the sheriff's supervision. Id. The court in Manders held that, despite the fact that a majority of the funding came from the county, because of the state's total control over the sheriff's office and the fact that the state does provide some funds, the "state involvement is sufficient to tilt the third factor of the Eleventh Amendment toward immunity." Id. at 1324.

The fourth factor is less clear. "Georgia courts speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions or misconduct of the sheriff or his deputies and is not required to pay resulting judgments." Id. at 1326. Furthermore, Georgia courts have held that counties are not liable, and are not required to give sheriffs money to pay, judgments against sheriffs in civil rights cases. Id. Additionally, the Georgia Supreme Court held that the county has no duty to furnish a sheriff with money to settle a civil rights judgment entered against him. Id. at 1326-27. However, the Manders court could "locate no Georgia law expressly requiring the state to pay an adverse judgment against [a sheriff] in his official capacity." Id. at 1327. The Manders court reasoned that if any party takes an adverse judgment against the sheriff's office, any funds used to pay the judgment would come from the sheriff's office's general budget. Id. at 1326-1328. Despite the fact that the state would not be liable for a judgment entered against a sheriff in his official capacity, the Manders court held that Eleventh Amendment analysis "is not limited to who foots the bill, and, at a minimum, the liability-for-adverse-judgment factor does not prevent [a sheriff's] immunity claim." Id. at 1328.

All four factors weigh in favor of finding that Sheriff Prine is an arm of the State in relation to making employment decisions for his office. The Court therefore concludes that the claims against Sheriff Prine in his official capacity constitute claims against the State of Georgia.

**2.    The Eleventh Amendment Bars Certain Claims Made By the Plaintiffs**

The Court must determine whether Sheriff Prine is protected by Eleventh Amendment immunity from the Plaintiffs' claims. The issue is whether Congress has eliminated Eleventh Amendment protection for any of the Plaintiffs' claims or whether the State of Georgia has consented to suit for any of the Plaintiffs' claims.

Congress abrogated state Eleventh Amendment immunity from Title VII suits. Fitzpatrick v. Bitzer, 427 U.S. 445, 447-48, 96 S.Ct. 2666, 2667-68, 49 L.Ed.2d 614 (1976). Sheriff Prine may therefore be sued in his official capacity for money damages for violating Title VII. All remaining claims for damages are barred by the Eleventh Amendment.

Congress has not abrogated the states' immunity from § 1983 money damages suits and Georgia has not consented to § 1983 suits. Williams, 477 F.3d at 1301. Likewise, an FMLA claim for damages against state entities for violation of the self-care provision, 29 U.S.C. § 2612(a)(1)(D), is barred by the Eleventh Amendment. See Batchelor v. S. Fla. Water Mgmt. Dist., 242 Fed. App'x 652, 652 (11th Cir. 2007) (finding that the Eleventh Amendment bars claims arising under the self-care provision of the FMLA). The Eleventh Amendment bars suits against state entities for violation of the ADEA. Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 91, 120 S. Ct. 631, 650, 145 L.Ed.2d 522 (2000). Congress has not abrogated the states'

immunity for suits for monetary damages for violations of Title I of the ADA.[8] Rizo v. Ala. Dept. of Human Res., 228 Fed. App'x 832, 835 (11th Cir. 2007).

There is no evidence presented that Georgia has waived its immunity from ADEA, ADA, or FMLA suits; as a result, the Eleventh Amendment bars ADEA, ADA, and FMLA claims for damages against state entities. See Ferst v. Norton, 2009 WL 927945, at *4 (M.D. Ga. March 30, 2009) (finding no evidence of waiver means Eleventh Amendment bar applies); Collier v. Clayton Cnty. Comm. Serv. Bd., 236 F. Supp. 2d 1345, 1364 (N.D. Ga. 2002) (finding no evidence of waiver).

Sheriff Prine is entitled to immunity, in his official capacity, from any § 1983, FMLA, ADEA, or ADA monetary award. The Plaintiffs' Title VII claims for damages may proceed against Sheriff Prine in his official capacity because Title VII is not barred by the Eleventh Amendment.

There is one exception. The Plaintiffs' claims for prospective injunctive relief against Sheriff Prine in his official capacity are not barred by the Eleventh Amendment. See e.g., Welch v. Laney, 57 F.3d 1004, 1008-09 (11th Cir. 1995) (finding prospective injunctive relief available in a § 1983 claim against a state entity). Plaintiffs assert that their claims for reinstatement and declaratory relief are not barred by the Eleventh Amendment since they are equitable claims and not

---

[8] Title I of the ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). Crews claims he was terminated because of his disability and does not name under which title of the ADA he brings suit. The Court concludes that his allegation is a Title I claim.

monetary damages claims. See e.g., Collier, 236 F. Supp. 2d at 1364 (finding equitable remedy for reinstatement is not barred by the Eleventh Amendment).

Sheriff Prine has not disagreed with the Plaintiffs' assertion. Accordingly, the Court will consider the Plaintiffs' claims for reinstatement, injunctive, and declaratory relief under § 1983, FMLA, ADEA, and ADA. It will reach the merits of the FMLA, ADEA, and ADA claims solely for the purpose of determining whether equitable relief is available to Plaintiffs.[9] It will reach the merits of the § 1983 claim to determine if equitable relief is available and additionally to determine whether Sheriff Prine, sued in his individual capacity, is liable for damages.

The Court will first consider the claim made against Sheriff Prine in his official capacity for monetary damages, the Title VII claim.

## B. Title VII Claims

### 1. Framework

Title VII prohibits discrimination by an employer against any individual with respect to conditions of employment because of the individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(a)(1). The McDonnell Douglas framework provides that a plaintiff may prove his Title VII discrimination case through

---

[9] The FMLA, ADEA, ADA claims asserted against Sheriff Prine in his individual capacity are dismissed by agreement, so a damage award against Sheriff Prine in his individual capacity for these claims is not available.

circumstantial evidence.[10]  Under this framework the plaintiff first presents a prima facie case of discrimination.   Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).

A plaintiff alleging wrongful discharge, as these Plaintiffs do, may typically establish a prima face case by showing that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was terminated; and (4) he was replaced by someone outside of his protected class.  Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).   In lieu of showing that he was replaced, a plaintiff may instead establish that similarly-situated individuals outside his protected classes were not terminated. See E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).

If the plaintiff presents a prima facie case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Wilson, 376 F.3d at 1087. This burden on the defendant to produce a legitimate nondiscriminatory reason is one of production and is "exceedingly light." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir.1994) (citation and quotations omitted).

If the defendant produces a legitimate, nondiscriminatory reason for its actions, then the burden of production shifts back to the plaintiff to offer evidence

---

[10] There is no evidence of direct discrimination in this case, so the Court applies the McDonnell Douglas analysis.

that the defendant's articulated reason is a pretext for discrimination.  Wilson, 376

F.3d at 1087. The plaintiff must show that the defendant lacks credence or that the

defendant was more likely motivated by a discriminatory reason than its proffered

reason. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir.1996)

(citation omitted).  A "proffered reason is shown to be pretext for discrimination only

when it is shown that the reason was false and that discrimination was the real

reason." Dawson v. Henry Cnty. Police Dep't, 283 Fed. App'x 545, 549 (11th Cir.

2007). Mere conclusory allegations of discrimination without more, are insufficient

to raise an inference of pretext or intentional discrimination where an employer has

offered extensive evidence of legitimate, non-discriminatory reasons for its actions.

Mayfield, 101 F.3d at 1376.

If the proffered reason is one that might have motivated a reasonable

employer, the employee "must meet that reason head on and rebut it, and the

employee cannot succeed by simply quarreling with the wisdom of that reason."

Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).

### 2.    Title VII Gender Claims

Bennett and Keene claim that Sheriff Prine terminated their employments

because of their sex. They claim that they were qualified for their positions, but were

fired and replaced by males. Sheriff Prine contends that he fired Bennett and Keene

for nondiscriminatory reasons and that Bennett and Keene cannot show that his

legitimate nondiscriminatory reasons were pretexts for sex discrimination.[11]

Bennett and Keene have established a prima facie case of discrimination for the purpose of this summary judgment motion. Sheriff Prine does not dispute that Bennett and Keene were qualified to do their jobs, were terminated, and replaced by males.

Sheriff Prine has provided legitimate nondiscriminatory reasons for terminating Keene and Bennett. Sheriff Prine stated that he was concerned that Keene did not wear her uniform at the jail and when driving a patrol car. (Prine Dep. at 140). He believed that there was a lack of communication between Keene, himself, Chief Crow, and Henderson. (Prine Dep. at 143). He believes that Keene did not notify him about issues arising at the Jail, that she did not communicate with her jailers, and that Keene was insubordinate. (Prine Dep. at 151, 159, 160, 165-66, 171). As for Bennett, Sheriff Prine explains that he fired Bennett because he did not think that Bennett should be supervised by her husband. (Prine Dep. at 103-04). He also fired her because he did not like her attitude toward him and because she wrongfully accused him of spreading rumors about her brother in a tone that he perceived to be disrespectful. (Prine Dep. at 101-02).

Bennett and Keene attempt to show pretext by pointing to Sheriff Prine's

---

[11] Sheriff Prine contends that Bennett has not shown a prima facie case because she cannot prove that similarly situated male employees were treated more favorably. The Court chooses to rely on the prima facie case requirements that require that a male employee replace a qualified female employee.

religious views. During his deposition Sheriff Prine testified that he was a member of Church of Christ. Plaintiffs' counsel asked Sheriff Prine numerous questions about whether he followed Bible verses describing gender differences.[12] Sheriff Prine agreed that his church followed the Bible verses read by Plaintiffs' counsel, but he explained that the Bible verses apply to the operation of the church and not outside in the secular world. (Prine Dep. at 23). Sheriff Prine testified that he has "no problem" with women serving in leadership in places outside the church. (Prine Dep. at 22). Sheriff Prine's deposition testimony does not show that he has religious views that caused him to discriminate against Keene and Bennett because they were women.

Keene and Bennett next attempt to show pretext by pointing to Sheriff Prine's hiring and promotion patterns. Statistical evidence can be pretext if the data has an analytic foundation. If not, the data "while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to hire." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 n.19, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (internal quotation marks and citation omitted). In this case, the promotion data does not account for the variables like whether women were eligible for the promotions that Sheriff Prine

---

[12] Bible verses included: (1) "But I suffer not a woman to teach nor to usurp authority over the man, but to be in silence;" (2) "Let the woman learn in silence with all subjection;" and (3) "But I would have you know that the head of every man is Christ and that the head of the woman is the man."

awarded to men. In this respect, the evidence does not indicate pretext. As for the evidence showing that Sheriff Prine hired more males than females, Sheriff Prine explained that his hiring depended on the ratio of men and women inmates in the jail. Female guards are limited to supervising female inmates and male guards are limited to supervising male inmates. If there was an increase in male inmates, Sheriff Prine hired a male guard, not a female. (Prine Dep. at 231). Sheriff Prine's explanation significantly undercuts the hiring record produced by Bennett and Keene as evidence of gender discrimination. Since the data lacks analytical validity, it is not probative evidence showing pretext.

Bennett's additional evidence of pretext is that during the meetings she had with Sheriff Prine in which her termination was discussed, Sheriff Prine never told her that the basis of her firing was because of her working relationship with her husband. It was not until their last meeting that she became aware that a reason for her termination was due to her work relationship with her husband. Prior to her termination, Sheriff Prine stated to Bennett's husband that he was planning to fire Bennett for personal reasons related to the campaign. (Prine Dep. at 27). During a termination meeting, Sheriff Prine told Bennett that he needed people around him to be loyal to him. (Prine Dep. at 29). Bennett's evidence of pretext is relevant to her First Amendment claims relating to campaign work, not her claim for sex discrimination. Additionally, this evidence does not show pretext because it constitutes an additional reason for termination that was disclosed to her prior to her

termination and that is not inconsistent with Sheriff Prine's other reason for her termination. See Tidwell v. Carter Prods., 135 F.3d 1422, 1428 (11th Cir. 1998) (finding nonconflicting additional reason is not pretext); Johnson v. Nordstrom, Inc., 260 F.3d 727, 733–34 (7th Cir. 2001) (finding no pretext where employer "simply supplemented its explanations in the context of litigation; there has been no retraction of any of its reasons for failing to promote [plaintiff] nor are any of its reasons inconsistent or conflicting.").

Keene's remaining evidence of pretext relates to her claim for retaliation, not sex discrimination. She presents evidence that Sheriff Prine began to find problems with her performance after she filed her EEOC discrimination charge and she alleges that he failed to discipline according to written policy or to write down in her record any complaints lodged against her. This evidence does not show that her reasons for termination were because of sex discrimination, but relate to retaliation. Moreover, it is described further below in this Order that this evidence for pretext in is insufficient to survive summary judgment.

Accordingly, summary judgment is granted to Sheriff Prine on Keene's and Bennett's Title VII gender claims.

### 3. Bennett's Title VII Pregnancy Claim

In a similar vein to her sex discrimination claim, Bennett asserts that she was terminated by Sheriff Prine because she was pregnant at the time of her termination.

The Pregnancy Discrimination Act amended Title VII by providing that the

prohibition against employment-related discrimination "on the basis of sex" includes discrimination based on pregnancy, childbirth, or related medical conditions.42 U.S.C. § 2000e(k). Sheriff Prine is granted summary judgment on this claim for the same reasons summary judgment is granted to Sheriff Prine on Bennett's sex discrimination claim. There is no evidence of pretext showing that she was terminated because of her pregnancy.

### 4. Keene's Title VII Retaliation Claim

Keene asserts that Sheriff Prine fired her in retaliation for engaging in two protected actions, which are: (1) her refusal to fire Williams after Williams filed an EEOC charge; and (2) Keene's filing an EEOC charge against Sheriff Prine.

To establish a prima facie case of retaliation, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir.1994) (citations omitted).

### i. Prima Facie Case

Statutorily protected expression includes filing an EEOC charge. Thus, Keene's filing of an EEOC charge on April 15, 2009 is protected activity and an act for which Sheriff Prine could not terminate her. 42 U.S.C. §§ 2000e-(3)(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has made a charge . . . under this subchapter.").

Keene's failure to terminate Williams is not as clearly protected activity. Statutorily protected activity includes an act that opposes "any practice made an unlawful employment practice by this subchapter." Id. To constitute a protected act a plaintiff must have a "good faith, reasonable belief that her employer has engaged in unlawful discrimination." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir.1999).

The Court will assume that Keene's failure to terminate Williams is protected activity solely for summary judgment purposes. The Court must determine whether there is a causal connection between her EEOC charge filing, her refusal to fire Williams, and her termination.[13] To establish a causal link, a plaintiff must show "that the protected activity and the adverse action were not wholly unrelated. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 920 (11th Cir. 1993) (quotations and citation omitted). To do this, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." Id. (citation omitted). Keene has presented evidence that Sheriff Prine was aware of her EEOC charge and her decision to decline to terminate Williams. (Keene Decl. ¶ 70). Accordingly, there is enough evidence showing a causal connection and the Court will move on to consider Sheriff Prine's asserted non discriminatory reasons for terminating her and whether those reasons are pretextual.

---

[13] Her termination constitutes an adverse employment action.

### ii.        Legitimate Nondiscriminatory Reasons and Pretext

Sheriff Prine's reasons for terminating Keene relate to her poor performance as a jail supervisor and Keene's failure to communicate with him and others. As already stated, these reasons are legitimate nondiscriminatory reasons for her termination. Keene fails to produce sufficient evidence showing these reasons were a pretext for retaliation discrimination.

Keene's retaliation theory is that "once the EEOC heated up its investigation into [Sheriff] Prine's conduct, he and Crow actively solicited complaints against Keene from her subordinates . . . and then summarily fired Keene, in violation of the Department's progressive discipline policy." (Pl. Res. Br. at 46). Keene tells the Court that this conclusion "is apparent from the information contained in Plaintiffs' 145 page long response to Defendants' Statement of Material Facts, and Keene's 93 page long declaration." Id.

There is no evidence that the anonymous complaint Prine received from the jail officers was manufactured or that Sheriff Prine sought to secure complaints to justify firing Keene. The complaint is part of the record, so it is undisputed that the complaint exists. Moreover, Sheriff Prine's failure to provide her a copy of the complaint prior to her termination does not make it likely that he sought to secure the complaint from the jailers in order to sabotage her employment. The Court concludes that Keene's assertion that the complaint was fabricated is entirely conclusory and not supported by the record evidence.

Keene argues pretext exists because she had a documented history of good performance prior to her filing her EEOC charge and there was no written documentation of the performance complaints lodged against her. It remains undisputed that there were problems at the Jail explained to Sheriff Prine through the anonymous complaint. Sheriff Prine warned Keene that he had concerns and told her that she would be terminated if his concerns were not addressed. His legitimate reason for terminating her is her poor performance. Because Keene was warned that she would be terminated if her performance did not improve and Sheriff Prine asserts her terminated her for her poor performance, her prior history of good performance does not rebut Sheriff Prine's legitimate nondiscriminatory reasons for her termination. See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir.1997) (holding that in a Title VII case, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's perceptions of his own performance.").

Keene next claims pretext exists because there was no documentary evidence of any warnings she received or of any concerns that Sheriff Prine had about her. She argues that the failure to create a written record of poor performance violates the Sheriff Office's policy. Contrary to Keene's assertion, the written policy cited to by Keene demonstrates that Keene was disciplined according to the policy. She received informal discipline prior to her termination. Informal discipline includes "verbal counseling" and was not limited to written warnings. (Keene Decl. ¶ 28, Ex. 9). Sheriff Prine's warning to her in August 2009 constitutes a verbal warning. Chief

Crow testified to the use of verbal warnings when he said that written reprimand is most common in the jail setting because "liability reasons." (Crow Dep. at 128), but he usually would make suggestions, not written reprimands or warnings in other situations. Id. Moreover, the policy does not state that deputies had to be warned or reprimanded, either verbally or in writing, prior to termination. Her claim of pretext is not supported by the record because she was in fact verbally warned that she would be terminated.

As for the communications failure asserted by Sheriff Prine as his reason for terminating her, Keene asserts pretext because Sheriff Prine did not inform her that she was to communicate with him at his office with any specified frequency (Keene Decl. ¶ 51) or that her current frequency of communication with him was insufficient.

Keene is incorrect that she was never warned by Sheriff Prine that her communications with him were inadequate. He told her, "[w]e need communications. . . You need to communicate to us . . . So, yes, we do have a problem." (Keene Decl. ¶ 203). While she was not told to meet with him at a certain frequency, Sheriff Prine told her that the frequency of communication with him did not meet his expectations.

Keene asserts other bases of pretext in the response to the statement of facts and in her declaration. She does not refer to these bases for pretext in her brief, apparently expecting the Court to fish through hundreds of pages to find them. Her failure to raise these bases for pretext in her brief is reason to not consider them.

But the Court has considered them and concludes that they do not show pretext.

The response to the statement of material facts explains that Sheriff Prine failed to provide a meaningful statement of the reasons for her termination to the Georgia Department of Labor and the Georgia Peace officers Standards & Training Counsel. He stated "insufficiency of leadership as the reason." While this may not be a thorough explanation for her termination, the explanation is consistent with Sheriff Prine's previous explanations for her termination. This is not evidence of pretext.

Keene asserts that Sheriff Prine's failure to follow the chain of command is evidence of pretext. Sheriff Prine did not provide her a copy of the anonymous letter when he received it so that she, as someone below him in the chain of command, could address the issues presented in the letter. Sheriff Prine did not consult her prior to the personnel turnover at the jail in violation of the chain of command and excluded her from an August 3, 2009 meeting concerning the jail also in violation of the chain of command. The chain of command policy does not prohibit Sheriff Prine from taking action outside the chain of the command. (Keene Decl. Ex. 4). Absent evidence that Sheriff Prine's ability to act outside the chain of command was restricted, the Court does not find Sheriff Prine's actions as evidence of pretext.

Keene also argues pretext on the basis that Sheriff Prine did not produce her performance evaluation that was due within a few days after her termination; instead he delayed its production until February 7, 2011. There is no evidence that Sheriff

Prine was obligated to produce the evaluation. The Court is also unaware of the contents of the evaluation. Unless the evaluation is inconsistent with Sheriff Prine's assessment of Keene's poor performance then the performance evaluation cannot serve as evidence of pretext.

Keene has not rebutted Sheriff Prine's legitimate reason for termination: that Keene failed to manage the Jail or communicate with him according to his standards. Since Keene has not rebutted these legitimate nondiscriminatory reasons for her termination, summary judgment is granted to Sheriff Prine on Keene's retaliation claim.

### C. Section 1983 Claims Against Sheriff Prine In His Individual Capacity

Title 42 U.S.C. § 1983 provides a remedy for those who have constitutional rights violated by state actors. Whiting v. Jackson State Univ., 616 F.2d 116, 121 (5th Cir. 1980).[14] "When a plaintiff sues a [state] officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).

### 1. Fourteenth Amendment § 1983 Claims

"[C]laims under § 1983 and Title VII generally have the same elements of

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

proof and use the same analytical framework . . . ." <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1265 (11th Cir.2001); <u>Busby v. City of Orlando</u>, 931 F.2d 764, 777 (11th Cir. 1991).

Keene and Bennett contend that their Fourteenth Amendment right to be free from gender discrimination was violated when Sheriff Prine terminated them. Keene's and Bennett's Title VII claims for gender and pregnancy discrimination failed because there was no evidence of pretext. Since the Title VII claims fail, the § 1983 gender and pregnancy claims must also fail. Summary judgment is granted to Sheriff Prine on the § 1983 claim for gender and pregnancy discrimination.

Sheriff Prine construes the complaint to include a § 1983 claim alleging that Keene's equal protection rights were violated when she was terminated for her protected EEOC activity. Keene's Title VII claim for retaliation failed for her failure to show pretext. Likewise, then, her § 1983 retaliation claim fails and summary judgment is granted to Sheriff Prine on the § 1983 retaliation claim.

Alternatively, Sheriff Prine has qualified immunity from this claim because no clearly established right exists under the equal protection clause to be free from retaliation. <u>Ratliff v. DeKalb County, Ga.</u>, 62 F.3d 338, 340-41 (11th Cir. 1995) (granting qualified immunity because "[t]he right to be free from retaliation is clearly established as a First Amendment right and as a statutory right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation."); <u>see also</u> <u>Jolivette v. Arrowood</u>, 180 Fed. App'x 883, 886-87 (11th Cir.

2006) (holding same).

## 2. First Amendment § 1983 Claims

Count One alleges a violation of Bennett's, Keene's, and Crews' right of freedom of political patronage. Construed as either First Amendment § 1983 claim for violation of the right to freedom of political patronage or a violation of the right to free speech, summary judgment is granted to Sheriff Prine.

### i. Political Patronage

Sheriff Prine asserts he is entitled to qualified immunity to the extent that Count One alleges a political patronage claim. A political patronage claim involves the public employer requiring its employees to support the in-party in order to maintain employment. Stough v.Gallagher, 967 F.2d 1523, 1527 (11th Cir. 1992) (citation omitted).

Terry v. Cook, 866 F.2d 373 (11th Cir. 1989) is controlling in determining if political patronage discharges are constitutional. In Terry, the Eleventh Circuit addressed what positions may permissibly be subject to political patronage action in the context of an Alabama county sheriff's office. Terry, 866 F.2d at 373. The court held that "[t]he closeness and cooperation required between sheriffs and their deputies" necessitated "absolute authority" by the Sheriff over hiring and firing his deputies. Id. at 377. The law of Terry is that at the time of the firings, a sheriff's conduct in Alabama, even if it was based on the plaintiffs' opposition to his candidacy is permissible.

Like the Alabama law addressed in <u>Terry</u>, Georgia law establishes a closeness and cooperation between sheriffs and their deputies, such that loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff. <u>Redding v. Tuggle</u>, No. 105-cv-2899, 2007 WL 2462641, at * 21 (N.D. Ga. July 11, 2007) (citing cases). Thus, <u>Terry</u> and <u>Redding</u> mean that Sheriff Prine could fire the Plaintiffs based on their failure to support his candidacy without violating the First Amendment. Since Sheriff Prine did not commit a constitutional violation for terminating the Plaintiffs because of their political opposition to him, the Plaintiffs' claims fail. Summary judgment is granted to Sheriff Prine on the First Amendment claim to the extent it is a political patronage claim.

### ii.     Free Speech Claim

The Plaintiffs complain for the first time in their response brief in opposition to the summary judgment motion that they were fired because of their campaign speech against Sheriff Prine. A free speech claim involves retaliation for the "overt expression of ideas or political speech." <u>Morris v. Crow</u>, 117 F.3d 449, 456 (11th Cir. 1997) (citation omitted).

Sheriff Prine argues this free speech claim should be dismissed because it was not raised in the pleadings and no timely motion to amend the complaint was filed. As stated earlier in the Order, any amendment to assert a free speech claim

is futile.[15] The amendment would be futile because Sheriff Prine is entitled to summary judgment on the basis of qualified immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation and quotations omitted).[16]

Where evidence of wrongful intent is an element of liability, a state official is entitled to qualified immunity if the record indisputably establishes that the official was in fact motivated, at least in part, by lawful considerations. Stanley v. City of Dalton, 219 F.3d 1280, 1296 (11th Cir. 2000); Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir.1996) ("Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct – despite his having adequate lawful reasons to support the act – was the result of his unlawful motive, the defendant is entitled to immunity.") So long as reasonable officials could disagree as to the legality of their conduct because of a the existence of a lawful

---

[15] In addition, the Court denies the motion to amend because it was untimely.

[16] A public official who asserts a defense of qualified immunity must establish that he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir.2004) (citation omitted). Where there is no dispute as to the discretionary nature of the actions complained of, like here, the Court must determine (1) whether the plaintiff has factually alleged the deprivation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); Holloman, 370 F.3d at 1264.

motive, then there is not a violation of a clearly established right. <u>Johnson v. City of Fort Lauderdale</u>, 126 F.3d 1372, 1379 (11th Cir.1997).

The record shows that Sheriff Prine had lawful reasons for terminating all the Plaintiffs and that he was at least in part motivated by those reasons.  Sheriff Prine heard that Crews could be a liability because Crews would not maintain confidential police matters under wraps.  Sheriff Prine was aware that Crews may have had  a gambling problem. Sheriff Prine wanted to bring Henderson into the Sheriff's Office, so he needed to create an opening. As for Keene, there were complaints about how she managed the Jail made after Sheriff Prine began his term. As for Bennett, it is not disputed that it was not permissible for her to work underneath her husband. It also undisputed that she accused Sheriff Prine of spreading rumors about her brother, which Sheriff Prine did not start, but were spread by someone else.

The record establishes that Sheriff Prine was motivated at least in part by those lawful reasons.  With Crews, it is not disputed that Sheriff Prine had another person in mind that he wanted to hire upon the commencement of Sheriff Prine's term and he felt he needed to terminate Crews in order to hire Henderson. It is further undisputed that Sheriff Prine was concerned about Crews' gambling habits and inability to maintain matters confidential. Even if those concerns ended up being baseless, Crews has not shown that Sheriff Prine did not have them.  Sheriff Prine admitted that he also terminated Crews because of Crews' political support for the opposing candidate, but that reason is not unconstitutional.  Since there were

permissible reasons that motivated Sheriff Prine to terminate Crews, the Court must grant qualified immunity.

With regard to Keene, Sheriff Prine warned her that she needed to fix the problems at the Jail or would be let go. In reference to the Jail problems, Sheriff Prine stated to Keene "I'm just telling you right now, I'm making you aware of it right now. I'll tell you something else, too. I just told you, if it doesn't improve over there . . . I'm telling you right now – if things don't change over there – you won't be there – you understand?" (Keene Decl. ¶ 203). There is no evidence that Sheriff Prine manufactured the problems at the Jail to justify a reason for terminating Keene. The record shows that he was at least in part motivated to terminate Keene by lawful reasons.

Regarding Bennett, it is undisputed that Sheriff Prine decided that he did not need Bennett because she wrongfully accused him of spreading rumors about her brother. (Prine Dep. at 95). He informed Bennett that he did not need her because of her comments and then later informed her that she also could not remain in her current position because Bennett was under the supervision of her husband. Sheriff Prine also asked Bennett whether she would work somewhere else in the department, but Bennett stopped him from continuing with the offer when she said that she needed to work with her K-9 dogs. By her statement, Sheriff Prine could not rearrange a position for her outside the supervision of her husband. The record displays Sheriff Prine relying on lawful reasons to terminate Bennett.

Under all these circumstances, Sheriff Prine's decision to terminate the Plaintiffs was "objectively reasonable" for the purpose of qualified immunity. Stanley, 219 F.3d at 1297. Accordingly, the Court finds that Sheriff Prine is entitled to summary judgment on Plaintiffs' First Amendment free speech claim due to qualified immunity. An amendment to the complaint to allege a free speech claim would therefore be futile. The motion to amend is denied.

### D. Equitable Claims for Violations of the FMLA, ADA, and ADEA

The Court addresses the merits of the Plaintiffs FMLA, ADA, and ADEA claims because to the Plaintiffs seek equitable relief under these claims. They are not entitled to money damages because of the Eleventh Amendment bar and because these claims made against Sheriff Prine in his individual capacity are dismissed.

### 1. FMLA

Crews and Bennett claim that they were terminated in retaliation for their assertion of their FMLA rights.[17]

To preserve the right to take leave, the FMLA creates two types of claims: interference claims, in which an employee alleges that his employer denied him a benefit guaranteed under the Act, 29 U.S.C. § 2615(a)(1), and retaliation claims, in

---

[17]The FMLA entitles an eligible employee to take twelve workweeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(D). In addition to taking twelve weeks of leave at once, an employee may take intermittent leave in separate blocks of time because of a single qualifying medical reason. 29 C.F.R. § 825.202(a).

which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act. 29 U.S.C. § 2615(a)(2). Bennett and Crews bring FMLA retaliation claims. Bennett was pregnant, so she required maternity leave. Crews was scheduled for knee surgery so he needed time off to heal. They believe Sheriff Prine terminated them because they requested FMLA leave.

To succeed on a FMLA retaliation claim a plaintiff must show that the employer acted with discriminatory or retaliatory animus when the plaintiff was discharged. Strickland v. Water Works & Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2006). In the absence of direct evidence of discrimination by the employer, the burden-shifting framework established in McDonnell Douglas, is applied in evaluating FMLA retaliation claims. Id. at 1207. To state a claim of retaliation an employee must first establish a prima facie case of retaliatory discharge. An employee must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. Id. at 1207.

Bennett and Crews contend that they requested FMLA leave from Sheriff Prine. Bennett testified, however, that she submitted a FMLA leave request to the human resources worker at Lowndes County and to someone in the Sheriff's office, but it was not to Sheriff Prine. (Bennett Dep. at 34-35). There is no evidence that

Sheriff Prine was aware of Bennett's FMLA request. Chief Crow testified only that he assumed Bennett would take time off when she had her baby and that Sheriff Prine was assumed to believe that as well. (Crow Dep. at 110). A general awareness that time off would be needed in the future does not satisfy the FMLA notice requirement. As for Crews, he testified that he never submitted a request for FMLA leave prior to his knee surgery. He requested to use his comp time. (Crews Dep. at 37). After his comp time was eliminated, he intended to ask for FMLA leave. (Crews Aff. ¶ 63).

Crews' failure to request FMLA leave means that the first prong of a FMLA retaliation prima facie case fails. There is no evidence that he engaged in any protected activity. Bennett's failure to notify Sheriff Prine that she submitted a FMLA leave request means she did not satisfy the third prong. She failed to establish that Sheriff Prine fired her for engaging in protected activity. The "unrebutted evidence [is] that the decision maker did not have knowledge that the employee [had engaged, or was attempting to engage,] in protected conduct." Strickland, 239 F.3d at 1207-08 (citation omitted). Sheriff Prine cannot be found to have retaliated against Bennett if her FMLA request was unknown to him.

Accordingly, Sheriff Prine is granted summary judgment on Crews' and Bennett's FMLA claims.

### 2. ADEA

Crews claims he was terminated in violation of the ADEA. The ADEA applies

to individuals who are at least 40 years old, and makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). "To establish a disparate-treatment claim under the ... ADEA, ... a plaintiff must prove that age was the but-for cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., --- U.S. ----, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009).

Where, as here, there is no direct or statistical evidence of age discrimination, the Court applies the burden-shifting framework established in McDonnell Douglas to evaluate ADEA claims based upon circumstantial evidence. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000).[18]

To establish a prima facie case of age discrimination under the ADEA, the plaintiff must demonstrate: "(1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." Smith v. Potter, 310 Fed. App'x 307, 310 (11th Cir. 2009) (citation omitted).

---

[18] In Gross, the Supreme Court noted that it "has not definitively decided whether" the McDonnell Douglas burden-shifting framework is appropriate in the ADEA context. Gross, 129 S.Ct. at 2349 n. 2. Nevertheless, the Eleventh Circuit has continued to apply McDonnell Douglas test in age discrimination cases decided after Gross. See Mora v. Jackson Mem. Found., Inc., 597 F.3d 1201, 1204 (11th Cir.2010) (per curiam).

Summary judgment must be granted to Sheriff Prine because there is no evidence that age was the but-for cause for Crews' termination, nor is there evidence of pretext. Sheriff Prine's reasons for terminating Crews were that Sheriff Prine wanted to create a hiring opening at the Sheriff's Office so he could hire Henderson; Crews had served long enough that his termination would not cause him to lose retirement benefits; Crews had a gambling problem; Crews could not maintain matters confidential; and Crews opposed Sheriff Prine's candicacy for sheriff. Even if the Court assumes that the gambling and confidentiality concerns were shown to be baseless, there is no evidence that the other reasons for terminating Crews were untrue or that age motivated Sheriff Prine's decision. See, e.g., Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir.2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

Since there is insufficient evidence of pretext and a failure to satisfy all the elements of a prima facie ADEA case, summary judgment is granted to Sheriff Prine on this claim.

### 3. ADA

Crews contends he was terminated in violation of the ADA. The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a prima facie case of discrimination under the ADA, "a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability." Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 910 (11th Cir.1996). A "disability" is defined in the statute as a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). A plaintiff must also demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. Gordon, 100 F.3d at 910-11. Once the plaintiff establishes a prima facie case, then the burden shifting analysis of Title VII discrimination actions applies. Hilburn v. Murata Electronics North Amer., 181 F.3d 1220 (11th Cir. 1999)

Crews contends that his disability is a twice-replaced knee which impairs his ability to walk, run, stand and engage in heavy physical exertion. Sheriff Prine argues that Crews does not have a disability as defined by the ADA because his replaced knees did not substantially limit any major life activity.

The regulations define "substantially limits" as rendering an individual "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the population can perform that same major life

activity." 29 C.F.R. §§ 1630.2(j)(1)(i)-(ii).

In this case, Crews testified that his first knee surgery rendered him unable to run. (Crews Dep. at 52, 66). The parties do not contest that Crews inability to run existed at the time of his termination. For summary judgment purposes Crews' inability to run renders him unable to perform the major life activity of running.[19] The Court will consider him disabled.

There is evidence that Sheriff Prine was aware prior to terminating Crews that Crews anticipated knee surgery on his second knee. (Crews Decl. ¶ 43). However, there is no evidence that he was fired because of the disability. All Crews has pointed to is that Sheriff Prine and Crow asked when the knee surgery was scheduled during the termination meeting. Mere awareness of a disability is not sufficient to show discrimination because of the disability. Moreover, the record establishes that Sheriff Prine terminated Crews for legitimate reasons. Accordingly, Crews has failed to produce a prima facie case of disability discrimination. Summary judgment is granted to Sheriff Prine on the ADA claim.

---

[19] There is some authority for the conclusion that running is not a major life activity. In  Fornes v. Osceola Cnty. Sheriff's Office, 2005 WL 2012285, at * 3 (M.D. Fla. Aug. 17, 2005), the district court relied on Toyota Motor Manuf., Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615, 534 U.S. 184, 194 (2002) to conclude that running is not of central importance to most people's daily lives and therefore is not a major life activity. The plaintiff appealed in Fornes.  The Eleventh Circuit declined to decide whether running is a major life activity as defined by the ADA. Fornes v. Osceola County Sheriff's Office, 179 Fed.Appx. 633, 634 (11th Cir. 2006).

## VI.    CONCLUSION

The motion to amend is denied. Summary judgment is granted to Sheriff Prine on all federal claims not abandoned or dismissed by agreement.  Seeing no reason to exercise jurisdiction over the Georgia state law claim, it is dismissed. The clerk is directed to close the case.

**SO ORDERED**, this the 22nd day of June, 2011.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

lmc